In re BAIRNCO CORPORATION SECURITIES LITIGATION.

This Document Relates to All Actions.

Alvin J. IVERS, Trustee of the Alvin J. Ivers, P.C. Pension Trust, Erik Ballan, William Steiner, Lee Bloom and Violet Klein, on behalf of themselves and all others similarly situated, Plaintiffs,

v.

KEENE CORPORATION and Glenn W. Bailey, Defendants.

Civ. A. Nos. 90 Civ. 2297 (WCC), 91 Civ. 2140 (WCC).

United States District Court, S.D. New York.

March 15, 1993.

Lowey Dannenberg Bemporad & Selinger, P.C. by William R. Weinstein, New York City, Chairman of Plaintiffs' Executive Committee, for plaintiffs.

Beatie, King & Abate, by Russel H. Beatie, Jr., New York City, for defendant Keene Corp.

Debevoise & Plimpton by Gary W. Kubek, New York City, for defendant Bairnco Corp. and all individual defendants.

## OPINION AND ORDER

WILLIAM C. CONNER, District Judge:

This discovery dispute arises in the context of a class action suit brought on behalf of persons who purchased Bairnco Corporation ("Bairnco") common stock between March 13, 1989 and April 2, 1990. The Amended Class Action Complaint alleges that Keene Corporation ("Keene"), a wholly owned subsidiary of Bairnco at all times relevant to this action, and defendant Glenn Bailey, chief executive officer of Keene and Bairnco, violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") and Rule 10b–5 promulgated thereunder. Pursuant to this Court's Opinion and Order of December 18, 1991, 780 F.Supp. 185, the only remaining claim against Keene alleges aider and abettor liability for materially false and misleading statements made in Bairnco's public disclosures during the class period. The instant dispute stems from this Court's October 30, 1992 Order directing defendants to produce certain documents. At issue are plaintiffs' document demands upon Keene and its asbestos counsel, Anderson Kill Olick & Oshinsky ("AKOO"), and McCarter & English ("M & E"). Defendant Keene now requests a reconsideration of the Court's Order on grounds of relevance, privilege, work-product immunity and excessive burden.

## BACKGROUND

Plaintiffs allege that defendants Keene and Bailey caused Bairnco to disseminate in its public disclosures information concerning Keene's financial condition which operated to inflate artificially the market price of Bairnco common stock. In particular, plaintiffs allege that defendants represented, without reasonable basis, that then present and reasonably foreseeable claims for asbestos-related damages and the cost of defense against such claims would not have a materially adverse impact on the financial condition of Keene and Bairnco. At the crux of plaintiffs' claim is the following statement contained in Bairnco's 1988 Annual Report:

Keene's management and counsel believe that there will not be a material adverse [e]ffect upon the consolidated financial position of Keene as of December 31, 1988 resulting from the disposition of existing and possibly unasserted asbestos cases. Management of Bairnco accordingly believes the disposition of such existing and possible unasserted asbestos cases will not have a material adverse effect on the consolidated financial position of Bairnco and its subsidiaries as of December 31, 1988.

Weinstein Aff.Exh. 5 (Bairnco December 1988 Form 10–K). The Annual Report premised this conclusion on five factors:

(1) Keene's insurance coverage; (2) Keene's experience to date with asbestos cases and their settlement, including Keene's review of the trends with respect to new case filings; (3) the benefit derived from the cooperation of co-defendants by means of the Center, including cost containment; (4) the potential reduction of Keene's share of indemnity as Manville, and possibly other responsible parties such as the U.S. Government, pay a share of liability contribution to asbestos case costs and (5) the book accrual established by Keene ...

Weinstein Aff.Exh. 5. These statements, alleged to be materially false and misleading, were consistently repeated in Bairnco's subsequent quarterly reports during the class period. Weinstein Aff.Exhs. 6–8 (Bairnco March, June, September 1989 Form 10–Q's).

In a press release issued on March 28, 1990, Bairnco reversed its prior assurances regarding the risks posed by asbestos claims against Keene. The release announced that Keene management could no longer determine whether Keene's ultimate asbestos related liability would have a material adverse effect upon Keene's financial position. Weinstein Aff.Exh. 9. Subsequent to the press release, Bairnco issued its Form 10–K report for the fiscal year ending December 31, 1989, which disclosed certain factors affecting the materiality of asbestos-related litigation on Keene's financial position, including, *inter alia:* (1) that as a member of the Center for Claims Resolution ("CCR") and prior to that,

the Asbestos Claims Facility ("ACF")[1], Keene bore a fixed percentage of the costs of all bodily injury cases, regardless of whether a claimant alleged exposure to a Keene asbestos product or named Keene as a defendant; (2) that more bodily injury cases were being filed in 1989 that had been filed against ACF members in 1988; (3) that substantially all of Keene's insurance coverage was either subject to litigation or dispute or would not be available until after such litigation or disputes and other issues were resolved. Weinstein Aff.Exh. 10 (Bairnco Form 1989 10–K). Following these revelations, the market price of Bairnco common stock fell over 50% in value, from a closing price of $13.65 on March 28, 1990, to a closing price of $6.25 on April 4, 1990.

*Pending Discovery Dispute*

Plaintiffs served Keene with a request for production of documents, dated June 2, 1992, to which Keene served its objections and responses identifying 420 documents withheld on the basis of varying combinations of asserted attorney-client, joint defense and work-product privileges. In addition, plaintiffs served Bairnco with a document production request to which Bairnco responded by identifying thirty-four documents withheld on similar grounds of privilege. At a September 25, 1992 Court conference requested by plaintiffs to discuss discovery issues, the Court directed defendants to produce:

> All communications from their attorneys concerning the prospects of any litigation against Bairnco, Keene and/or any other Bairnco subsidiary seeking damages in connection with the sale of asbestos products and Bairnco's or Keene's economic exposure in connection therewith.

The Court's oral direction was formalized in a written Order dated October 30, 1992. The Court noted that the documents were only to be used for the purposes of the present securities action and indicated its willingness to issue a protective order to that effect.

To the extent that Keene indicated it had neither produced nor included in its privilege list documents in the possession of third parties including outside counsel, plaintiffs served AKOO with a subpoena on October 23, 1992 demanding documents ordered to be produced by the Court's order, as well as other documents which were, according to plaintiffs, "potentially relevant." Pl.Mem. at 11. Plaintiffs subsequently subpoenaed from M & E documents comparable to those subpoenaed from AKOO.

At a November 6, 1992 Court conference requested by new counsel for Keene to discuss further the Court's October 30, 1992 Order, the Court granted Keene an extension until November 23, 1992 to review the 420 withheld documents and designate those documents that would be produced without delay, with those claimed to be privileged to be presented to the Court for *in camera* inspection. At the November 23, 1992 follow-up conference, Keene's counsel indicated that upon closer review Keene had agreed to produce most of the withheld documents, but requested the Court to inspect *in camera* seventy-seven documents for which Keene still claimed a privilege. At that conference, the Court set trial for June 28, 1993 and designated May 1, 1993 as the date by which discovery should be completed.

Following *in camera* inspection of the seventy-seven documents presented by Keene, the Court directed Keene to produce all or parts of eleven documents,[2] upholding Keene's claimed privilege as to the rest. The Court was under the impression that the documents indicated would be produced without delay unless Keene shortly notified the Court of its desire to request additional time to file a petition for a writ of mandamus seeking vacation of the discovery order. By this time, defendant Bairnco had produced

---

1. In 1985, Keene was one of 35 companies which entered into an agreement resulting in the formation of a not-for-profit corporation, the ACF, created to act as a claims handling facility for asbestos-related personal injury claims against each member. The ACF ceased to function in 1988 and was replaced by the CCR. Keene was a member of the ACF from 1985 to 1988, and a member of the CCR from its forma-

tion in 1988 until Keene left in 1990. Warshauer Aff. at 15–19.

2. The Court ordered parts of certain documents redacted prior to production where the information contained was deemed to be only marginally relevant or where the discussion pertained to litigation strategy.

the majority of the documents it initially designated as privileged. In response to Keene's failure to act on the Court's direction, the Court held another conference on January 29, 1993. At that conference, Keene requested leave to file this motion seeking a reconsideration of the Court's October 30, 1992 Order with respect to the eleven documents demanded from Keene, and a ruling setting aside plaintiffs' document requests upon AKOO and M & E.

## DISCUSSION

As noted, the eleven documents directed to be furnished by Keene are sought to be withheld on grounds of relevance, privilege and work-product immunity. Keene also seeks to avoid production of documents from AKOO and M & E on the additional ground that production would pose an unreasonable burden.

### Relevance

■ The standard of relevance for discovery purposes is broadly defined to encompass "any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Daval Steel Products v. M/V Fakredine*, 951 F.2d 1357, 1367 (2d Cir.1991) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351, 98 S.Ct. 2380, 2389, 57 L.Ed.2d 253 (1978)); *see also Morse/Diesel, Inc. v. Fidelity & Deposit Co.*, 122 F.R.D. 447, 449 (S.D.N.Y.1988) (term "reasonably calculated" in Fed.R.C.P. 26(b)(1) means "*any possibility* that the information sought may be relevant to the subject matter of the action*"); *Martin v. Valley Nat. Bank of Arizona*, 140 F.R.D. 291, 300 (S.D.N.Y.1991); 4 James Moore & Jo Desha Lucas, *Moore's Federal Practice* ¶ 26.51[1] (2d ed. 1991). The relevance of a particular matter is to be determined in light of the claims and defenses asserted by the parties. *Martin*, 140 F.R.D. at 300 (citing cases).

Keene takes the curious position that documents containing communications from counsel to Keene during the pertinent period concerning the prospects of asbestos litigation and Keene's economic exposure therefrom would contain no information relevant to a securities fraud case that alleges material misstatements regarding the effect of asbestos cases on Keene's financial condition. Such information would only be relevant, Keene contends, if Keene were to defend on the ground that it relied on advice of counsel. Def.Mem. at 5.

Keene's stance on this issue is surprising, if not disingenuous. Information given to Keene by its counsel concerning Keene's asbestos liability should be highly revealing as to the veracity and sufficiency of Keene's public disclosures concerning its economic exposure and, perhaps more importantly, particularly probative of Keene's good or bad faith in making such disclosures. Keene's views as to its litigation prospects were surely informed by, if not wholly dependent upon, the information and advice provided by counsel. If Keene's public statements were in conflict with the opinions it received from its counsel, this would be highly relevant evidence on the issue of Keene's scienter. Indeed, the very fact that advice of counsel will not be a defense suggests that there may have been variance between Keene's public disclosures and the information received from its counsel. The documents sought under the Court's October Order are thus clearly calculated to lead to the discovery of admissible evidence regardless of whether or not Keene raises the advice of counsel defense. These communications would be considered relevant even under a less than liberal construction of the term; surely they fall within the broad limits of relevance embraced by our courts.

### Attorney–Client Privilege

■ We begin this inquiry keenly aware that the attorney-client privilege both advances and impedes the administration of justice. Preserving client-counsel confidences promotes full and frank communication so that the course of legal representation may not "founder in the absence of the client's subjective freedom of mind." *Matter of Grand Jury Subpoena Duces Tecum, Nov. 16, 1974*, 406 F.Supp 381, 385 (S.D.N.Y.1975); *In re Von Bulow*, 828 F.2d 94 (2d Cir.1987). At the same time, the privilege operates to obstruct access to otherwise discoverable evidence, contrary to the precept that "the public has a claim to every man's evidence." 8

Wigmore, Evidence § 2192 at 71 (McNaught-en rev. ed. 1961). The strain between these competing aims is particularly evident in the present circumstances: on the one hand, Keene faces exposure to some 90,000 asbestos-related cases and thus bears a vital interest in maintaining the confidentiality of client-counsel communications on asbestos-related matters; on the other, communications from counsel concerning asbestos-related litigation will likely contain evidence lying at the core of plaintiffs' case. This Court must necessarily reconcile these competing concerns; it must ensure that a blanket assertion of the privilege does not shield evidence discoverable under prevailing standards and, alternatively, that an expansive discovery request does not reach matters properly withheld under the privilege. The Court's order requiring production of documents concerning the prospects of asbestos-related litigation and Keene's economic exposure therefrom, and its subsequent direction that Keene produce eleven of the seventy-seven documents presented for *in camera* review was an effort to strike such a balance. In pursuing this motion to reconsider, Keene wishes the Court to rethink, or at least formally articulate, the grounds upon which Keene's asserted privilege may be overcome. More than one ground can be offered.

Plaintiffs initially claim that the attorney-client privilege should not attach in the first instance because the communications at issue are prone to be predominated by business considerations rather than legal advice, citing *SCM Corp. v. Xerox Corp.*, 70 F.R.D. 508, 517–18 (D.Conn.), *appeal dismissed*, 534 F.2d 1031 (2d Cir.1976). *See also, U.S. v. Davis*, 131 F.R.D. 391 (S.D.N.Y.1990). Indeed the bulk of the information contained in most of the documents in question can be characterized in this fashion. The documents contain statistical reports on outstanding claims, classifications of asbestos-related exposure by various categories, charts sketching newly filed, pending and concluded cases, billing and cost summaries, and similar data reflecting the existence, volume, and objective character of asbestos claims; information that may well fall beyond the protection of the attorney-client privilege. However, because first, not all the communications in question

can be readily categorized as business rather than legal in nature, second, the distinction between legal and business concerns is necessarily blurred when viewed in the context of Keene's litigation-beset situation and, third, other grounds exist to breach the privilege, we choose not to rely on this distinction to direct production of the documents in question.

Plaintiffs contend that even if the withheld documents are found to constitute privileged communications, under the rationale of *Garner v. Wolfinbarger*, 430 F.2d 1093 (5th Cir.1970), *cert. denied*, 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), good cause exists for the privilege to be abrogated. *Garner* addressed the question whether a corporate defendant, subject to a shareholder suit on federal and state securities fraud grounds, could validly assert the attorney-client privilege against requests for discovery:

> [W]here the corporation is in suit against its stockholders on charges of acting inimically to stockholders interests, protection of those interests as well as those of the corporation and of the public require that the availability of the privilege be subject to the right of the stockholders to show cause why it should not be invoked in the particular instance.

430 F.2d at 1103–04. The doctrine spawned in *Garner* has been applied by several courts in cases where corporate management has attempted to shield communications from shareholders on the basis of attorney-client privilege. *Quintel Corp., N.V. v. Citibank, N.A.*, 567 F.Supp. 1357, 1361 (S.D.N.Y.1983) (citing several cases); *see, e.g., Fausek v. White*, 965 F.2d 126 (6th Cir.1992); *Ohio–Sealy Mattress Mfg. Co. v. Kaplan*, 90 F.R.D. 21 (N.D.Ill.1980); *Cohen v. Uniroyal Inc.*, 80 F.R.D. 480 (E.D.Pa.1978). While *Garner* arose in the context of a shareholder derivative suit and has been thus limited by the Ninth Circuit, *see Weil v. Investment/Indicators, Research & Management*, 647 F.2d 18 (9th Cir.1981), nothing in the language or reasoning of *Garner* so limits its holding. The Fifth Circuit has rejected the *Weil* court's limitation on *Garner*, *see Ward v. Succession of Freeman*, 854 F.2d 780, 786

(5th Cir.1988)³, as has the Sixth Circuit, *see Fausek v. White,* 965 F.2d 126, 130–31 (6th Cir.1992).

Neither plaintiffs nor defendants address the issue whether *Garner* can be applied to circumstances where plaintiffs were not necessarily shareholders during the pertinent period of the communications in question. Applicability of the *Garner* doctrine has typically rested on the existence of a fiduciary duty or mutuality of interest between the corporation and its shareholders at the time of the communications sought to be discovered. *See Fausek,* 965 F.2d at 132; *Quintel,* 567 F.Supp. at 1360; *Moskowitz v. Lopp,* 128 F.R.D. 624 (E.D.Pa.1989). The viability of the doctrine in situations where the plaintiff class is comprised of individuals who were "purchasers" rather than "shareholders" during the period of the communications at issue was discussed in *Cohen v. Uniroyal, Inc.,* 80 F.R.D. 480, 484 (E.D.Pa.1978). The *Cohen* court found *Garner* applicable nevertheless:

> The literal distinction [between purchasers and shareholders] does not deter the basic rationale of *Garner,* which is that "management judgement must stand on its merits, not behind an ironclad veil of secrecy which under all circumstances preserves it from being questioned by those for whom it is, at least in part, exercised." *Garner v. Wolfinbarger,* 430 F.2d at 1101. The class certified in this case does not include any putative purchasers, but encompasses only those purchasers that actually bought Uniroyal stock and thereby became stockholders. That the special relationship of management-to-stockholder existed as to all class members for some period, however brief, thrusts those class members ineluctably within the scope of the protection afforded by the *Garner* doctrine. It is true that at the time of the allegedly fraudulent conduct the class members had not yet purchased stock and had therefore not yet entered the favored "mutuality of interest" relationship with management. *Id.* The fact remains, however, that the private cause of action for fraud under § 10(b) was not complete until the class members had

incurred some damages. No actionable fraud existed, in other words, until the "purchasers" had become stockholders by purchasing Uniroyal stock at prices that had been improperly inflated as a result of the management's alleged misconduct. It is appropriate, then, to apply *Garner's* test of good cause to the present case.

80 F.R.D. at 484.

We quote at length from *Cohen* because we find its reasoning persuasive and applicable to the present circumstances. A few courts have questioned the decision reached in *Cohen, see In re Atlantic Financial Mgmt. Securities Lit.,* 121 F.R.D. 141, 146 (D.Mass 1988) (if stock not yet purchased, fiduciary duty did not exist and therefore *Garner* rationale does not apply); *c.f. Shirvani v. Capital Investing Corp., Inc.,* 112 F.R.D. 389, 390–91 (D.Conn.1986) (finding good cause exception vague, difficult to apply and superfluous when traditional crime or fraud exception available), with the most explicative critique provided by *Moskowitz v. Lopp,* 128 F.R.D. 624 (E.D.Pa.1989):

> Since the decision in *Cohen,* litigation under Rule 10b–5 has been proliferous.... To expose otherwise privileged communications between corporate management and corporate counsel to wholesale invasion without some showing of a fiduciary duty to the plaintiff is to engage in an anachronistic legal fiction with serious consequences to the efficacious and just management of corporate affairs.

128 F.R.D. at 637. Because the plaintiff in *Moskowitz* was not a shareholder at the time of the communications in question, the Court denied his motion for "wholesale production" of documents, referring the matter to a Special Master for a document-by-document determination of the privilege. *Id.*

Application of *Garner* arises in the present case under notably different circumstances. Rather than submitting to the "invasion" of an expansive document sweep sought by plaintiffs, defendants were directed only to produce documents that fell within a Court-specified order aimed at information central

---

**3.** The *Ward* court did note that the fact plaintiffs may be acting for their own interests rather than on behalf of the corporation is a factor to be considered in determining whether good cause exists for suspending the privilege.

to plaintiffs' case. Further, the Court reviewed *in camera* each item claimed privileged that fell within the reach of its Order and directed disclosure of only eleven of seventy-seven documents, rather than requiring "wholesale production" of all applicable documents. In these circumstances, we think it appropriate to apply the *Garner* test to the case at bar under the rationale offered in *Cohen.*

■ Guided by the indicia of good cause enunciated in *Garner*[4], we find plaintiffs have shown sufficient cause to abrogate the attorney-client privilege with respect to the eleven documents within Keene's possession. As alleged in the complaints, the plaintiff class is fairly substantial, comprised of purchasers during the class period of 7.5 million of the 10.4 million total outstanding Bairnco common shares. Pl.Mem. at 46. Plaintiffs' securities fraud allegations are of colorable merit, with the surviving claim against Keene having withstood a motion to dismiss. As already noted, the documents sought relate directly to plaintiffs' claims and are not apt to be readily available from alternate sources. The communications concern past actions and knowledge, and are unlikely to reveal or impact future conduct. Obviously, the communications sought do not contain advice concerning the instant litigation; moreover, any matter related to litigation strategy concerning the asbestos claims has been ordered redacted. Rather than license plaintiffs for a fishing expedition, the documents were directed produced under a Court Order identifying only communications *from* defendants' attorneys (not *to* them) concerning the prospects of asbestos litigation and Keene's economic exposure therefrom. Finally, to the extent issues of confidentiality arise, the Court has indicated its willingness to issue an appropriate protective order.

For these reasons, we find good cause under *Garner* to abrogate any attorney-client privilege that may attach to the documents in question.

■ Plaintiffs additionally offer an alternate ground to override Keene's claimed privilege, based on the fact that the very nature of plaintiffs' claims and defendants' plausible defenses places at issue the content of the communications sought to be withheld. Since the beliefs held and opinions expressed by Keene's counsel concerning the condition of asbestos-related litigation will necessarily be in question, concealing these communications from discovery, argue plaintiffs, permits Keene to use the attorney-client privilege at once "as a shield and a sword." *See U.S. v. Bilzerian,* 926 F.2d 1285, 1292–93 (2d Cir.1991):

> A defendant may not use the privilege to prejudice his opponent's case or to disclose some selected communications for self-serving purposes.... Thus, the privilege may implicitly be waived when defendant asserts a claim that in fairness requires examination of protected communications.

Keene maintains adamantly that it will not claim advice of counsel as a defense; if Keene did assert this defense, the communications in question would obviously be discoverable. Nevertheless, the concerns underlying the Circuit Court's decision in *Bilzerian* mandate disclosure of the communications in this instance. The conclusions in Keene's public disclosures that are alleged to be materially false and misleading were specifically claimed to be based upon the belief of "Keene's management *and counsel.*" Further, while Keene may not formally raise an advice of counsel defense, Keene's reliance in its motion papers on the conclusions reached

---

4. The Fifth Circuit listed several factors to be considered in determining the existence of good cause: (1) the number of shareholders and the percentage of stock they represent; (2) the bona fides of the shareholders; (3) the nature of the shareholders' claim and whether it is obviously colorable; (4) the apparent necessity or desirability of the shareholders having the information and the availability of it from other sources; (5) whether if the shareholders' claim is of wrongful action by the corporation, it is of action criminal, or illegal but not criminal, or of doubtful legality; (6) whether the communication related to past or to prospective actions; (7) whether the communication is of advice concerning the litigation itself; (8) the extent to which the communication is identified versus the extent to which the shareholders are blindly fishing; (9) the risk of revelation of trade secrets or other information in whose confidentiality the corporation has an interest for independent reasons. 430 F.2d at 1104.

by its counsel,[5] (in an effort to persuade the Court that the fraud exception to the attorney-client privilege does not apply), bespeaks volumes about the posture of Keene's defense at trial.[6] Moreover, irrespective of the legal defenses Keene expects to raise, plaintiffs' case will perforce place at issue Keene's knowledge of its litigation condition and the factual basis for this understanding. The opinions rendered by Keene's counsel, as well as the underlying facts and information passed to Keene from counsel, are clearly relevant to the central issue of scienter. To permit Keene to offer the fact of counsel's conclusions where such conclusions serve Keene's purposes without permitting plaintiffs access to all the communications between counsel and Keene would prejudice plaintiffs in the prosecution of their action. *See Bilzerian*, 926 F.2d at 1292 (defendant's testimony that he thought his actions were legal would have put his knowledge of the law and the basis for his understanding of what the law required in issue; conversations with counsel regarding the legality of his schemes would have been directly relevant in determining the extent of his knowledge and thus his intent). The Second Circuit's rationale in *Bilzerian* thus offers an alternate basis to abrogate the privilege Keene asserts.

 Although plaintiffs do not raise the crime-fraud exception to the attorney-client privilege, we think this exception may offer yet another ground upon which to order production of the documents in question. It is well-established that communications that otherwise would be protected by the attorney-client privilege are not protected if they relate to communications in furtherance of contemplated or ongoing criminal or fraudulent conduct. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1038 (2d Cir. 1984). For the crime-fraud exception to apply, first, there must be a reasonable basis to suspect the perpetration or attempted perpe-

tration of a crime or fraud and, second, the communications must be in furtherance thereof. *Id.* at 1039; *In re International Systems & Controls Corp*, 693 F.2d 1235, 1242 (5th Cir.1982). The first condition may be met by showing that the client was engaged in planning a fraudulent scheme when seeking advice from counsel, or attempted fraud after receiving the benefit of counsel's work. *In re Sealed Case*, 676 F.2d 793, 814–816 & n. 92 (D.C.Cir.1982) (all that is required is that the likelihood of violation be sufficient as a *prima facie* matter). The second condition may be met by a finding that the communications reasonably relate to the subject matter of the possible violations. *Id.* at 815; *Duttle v. Bandler & Kass*, 127 F.R.D. 46, 53–54 (S.D.N.Y.1989) (communications relating to operation of sales staff not privileged because staff used as instrument of fraud).

Although Keene maintains plaintiffs lack the facts sufficient to establish a *prima facie* case, (Def.Mem. at 9), we think the facts presented by plaintiffs are sufficient to pass muster at this stage of the inquiry. *See In re Sealed Case*, 676 F.2d at 815 (showing is sufficient if party proffers evidence that, if believed by trier of fact, would establish elements of some violation, ongoing or about to be committed). The evidence presented in plaintiffs' brief ("Plaintiffs' Case in a Nutshell," Pl.Mem. at 12–28), does raise questions as to the complete candor of the conclusions presented in the allegedly fraudulent disclosure statements, the premises offered for those conclusions, as well as the point when Keene became or should have become aware of the facts later specified as reasons for the change in its conclusions concerning the financial impact of asbestos-related litigation. Plaintiffs' evidence includes: Keene's decision to withhold from its financial statements information regarding the average settlement cost of asbestos cases,[7] which is al-

---

5. Keene states in its brief: "In fact, as the Bairnco documents show, the hypothetical claim has no substance. Keene's asbestos litigation counsel concluded throughout the class period (and as late as February 1990) that the asbestos litigation would have no material effect upon Keene's financial position." Def.Mem. at 9.

6. Plaintiffs also point out that two defendants, "who were non-management Bairnco directors, testified at deposition regarding their reliance on what they were told by counsel, including Keene in-house counsel." Pl.Mem. at 44.

7. The information was allegedly withheld because it was deemed "unnecessarily alarming

leged to have deprived the market of the ability to evaluate the impact of asbestos litigation on a historical basis (Pl.Mem. 13–14); defendants' decision to reject their accountants' use of historical information to assess the materiality of existing asbestos cases and their reliance on trends in case mix, though Keene's inside counsel seemed to recognize the lack of sufficient data to assess the impact of trends in case mix (Pl.Mem. at 14–15); the advice from Keene's accountants, as early as January 1987, that asbestos-related liability was approaching the level of available insurance and reserves (Pl.Mem. at 16); Keene's election to continue to ignore the impact of unasserted claims (Pl.Mem. at 16) (the inability to determine the amount of unasserted claims was noted as a reason for the later inability to determine the materiality of asbestos litigation); Keene's knowledge by November 1989, prior to the issuance of the third-quarter Form 10–Q report on November 13, 1989, that insurer disputes were affecting Keene's ability to pay its bills from the CCR (Pl.Mem. at 19–20); failure to disclose the fact that under agreements with the ACF/CCR, Keene bore a fixed percentage of the costs of all bodily injury cases, regardless of whether a claimant alleged exposure to Keene asbestos products, or named Keene as a defendant (Pl.Mem. at 23); and finally, information that may have caused Keene to question any reliance on Manville Trust and on its claim against the United States. (Pl. Mem. at 25–27).

■ Keene suggests that the fraud exception cannot be invoked unless plaintiffs show that the letters sent from AKOO to Keene, evidencing AKOO's conclusion that asbestos-related litigation would not have a materially adverse effect on Keene's financial condition, were themselves fraudulent or prepared by AKOO to assist in the furtherance of fraud. Def.Mem. at 9. Keene is wrong. The intent, knowledge or culpability of counsel is not the dispositive factor; a communication of advice provided in good faith by

counsel may yet lose its privileged status if its substance is misrepresented by the client with intent to defraud. *In re Grand Jury Subpoena Duces Tecum*, 731 F.2d at 1038; *Duttle*, 127 F.R.D. at 53. The communication with counsel need only reasonably relate to the subject matter of the violation. *In re Sealed Case*, 676 F.2d at 815. This requirement is certainly met in the instant case; Keene's public disclosures that are alleged to be fraudulent were assertedly based on the belief of Keene's management *and counsel*. If the disclosures were fraudulent because they misrepresented the opinion of counsel, the communications of counsel, though not *made* with the intent to defraud would at least have been *used* with such intent. Thus, although plaintiffs do not invoke the fraud exception to the attorney client privilege, we think the exception offers another basis to order discovery of the communications in question.

■ Plaintiffs also suggest that Keene has waived the attorney-client privilege by its "repeated and ongoing disclosure of the subject matter of those documents with its accountants, [Arthur Anderson], and with other third parties." Pl.Mem. at 48. Because it is unclear whether this representation applies to all the documents in question, and because of the existence of other grounds upon which to order production, we choose not to address the merits of this position.[8]

### Joint Defense Privilege

■ Keene claims the joint defense privilege for those documents containing communications from the ACF and CCR, the two multi-member organizations created to handle asbestos-related personal injury claims against each member company. Keene was a member of the ACF from 1985 to 1988, and a member of the CCR from 1988 until 1990. The facilities' claims-handling function extended to such matters as administering insurance coverage and resolving cases

and misleading to users of the financial statements." (Weinstein, Aff.Exh. 19).

8. We do note, however, that the mere fact any such communication, or its substance, was divulged to Keene's accountants is not necessarily

sufficient to abrogate the attorney-client privilege. *See U.S. v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) (discussing conditions where communications may be disclosed to accountants without relinquishing attorney-client privilege).

through settlement. Keene notes that "one benefit of the agreement was the joint representation and defense of member companies" (Warshauer Aff. at 16), and argues that the communications at issue "relate to all participants' common defense of claims." Def. Mem. at 10.

■ The joint defense privilege is described as "an extension of the attorney client privilege." *U.S. v. Schwimmer*, 892 F.2d 237, 243 (2d Cir.1989) (citing *Waller v. Financial Corp. of Am.*, 828 F.2d 579, 583 n. 7 (9th Cir.1987)). It serves to protect the confidentiality of communications from one party to another where the communications are "part of an on-going and joint effort to set up a common defense strategy." *In re Bevill, Bresler & Schulman Asset Mgmt.*, 805 F.2d 120, 126 (3d Cir.1986); *see also U.S. v. Bay State Ambulance and Hosp. Rental Serv.*, 874 F.2d 20, 28 (1st Cir.1989); *Schwimmer*, 892 F.2d at 243. In order to establish the existence of a joint defense privilege, the party asserting the privilege must show that (1) the communications were made in the course of a common defense effort, (2) the statements were designed to further that common defense, and (3) the privilege has not been waived. *In re Bevill*, 805 F.2d at 126 (citing *In re Grand Jury Subpoena Duces Tecum Dated November 16, 1974*, 406 F.Supp. 381 (S.D.N.Y.1975)); *see Schwimmer*, 892 F.2d at 243–244.

Plaintiffs argue that the communications in question cannot be said to have been made in the course of a common defense, because the ACF and CCR were intended to operate "as claims handling facilities rather than as a joint defense effort." Pl.Mem. at 53 (referencing statement by director of Keene risk management to that effect). Without considering this distinction plaintiffs attempt to draw, we find the contents of the documents in question to be of a nature that falls beyond the bounds of the privilege claimed. After reviewing each of the documents *in camera*, we conclude that they cannot be characterized as communications pertaining to defense strategy, or designed to further a common defense in any particular litigation or claim for that matter. Nor can they be portrayed as relating to elements of a broader claims

resolution strategy adopted by the facilities. Rather the documents relate generally to statistics summarizing the status of asbestos claims processing and litigation, charts classifying the nature of claims by various categories, lists detailing the disposition of outstanding claims, related costs and the filing of new claims, and other similar data. Keene cannot invoke the joint defense privilege to protect such information from discovery. *See Polycast Technology Corp. v. Uniroyal, Inc.*, 125 F.R.D. 47, 51 (S.D.N.Y.1989); *cf. In re Grand Jury Subpoena Duces Tecum Dated November 16, 1974*, 406 F.Supp. at 386–393.

### Work–Product Privilege

■ The attorney work-product privilege attaches to documents prepared principally in anticipation of litigation or for trial by a party or his representative. *United States v. Gulf Oil Corp.*, 760 F.2d 292, 297 (Temp.Emer.Ct.App.1985) (citing *Hickman v. Taylor*, 329 U.S. 495, 511–12, 67 S.Ct. 385, 393–94, 91 L.Ed. 451 (1947)). The privilege protects "an attorney's mental impressions, opinions or legal theories concerning specific litigation" from disclosure. *Horn & Hardart Co. v. Pillsbury Co.*, 888 F.2d 8, 12 (2d Cir.1988). The Court in *Gulf Oil* noted that the inquiry should be to determine whether the motivating purpose behind the creation of a particular document was "to assist in pending or impending litigation." 760 F.2d at 296. If the privilege does attach, it may yet be overcome "upon a showing that the party seeking discovery has substantial need of the materials in the preparation of the party's case and that the party is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 26(b)(3); *see Horn & Hardart*, 888 F.2d at 12; *see also, Upjohn Co. v. United States*, 449 U.S. 383, 400, 101 S.Ct. 677, 688, 66 L.Ed.2d 584 (1981). If discovery is deemed appropriate, the Court is directed to "protect against disclosure of the mental impressions, conclusions, opinions or legal theories of an attorney or other representative of a party concerning the litigation." Fed.R.Civ.P. 26(b)(3); *see Martin v. Valley Nat. Bank of Arizona*, 140 F.R.D. 291, 304 (S.D.N.Y.1991).

Plaintiffs contend that the work-product privilege should not be available because the documents in question were not drafted to assist Keene's counsel prepare for litigation. "It is well-established," plaintiffs argue, "that the mere existence of that litigation alone or counsel's request that the documents be prepared will not convert business documents into work product," citing *Simon v. G.D. Searle & Co.*, 816 F.2d 397, 401 (8th Cir.), *cert. denied*, 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987) (risk management documents relating to pending product liability suits used in business planning not work product); *Gulf Oil Corp.*, 760 F.2d at 297 (documents generated for business purpose of creating financial statements which would satisfy requirements of federal securities laws not protected by work-product privilege); *Binks Mfg. v. National Presto Indus., Inc.*, 709 F.2d 1109, 1118–21 (7th Cir.1983) (letters prepared by counsel relating to facts that gave rise to litigation not work product). Pl.Mem. at 55–56. If the privilege is found to attach, plaintiffs maintain they have shown substantial need for the documents to obtain discovery.

After having reviewed the documents *in camera*, we remain unconvinced by Keene's rather conclusory assertion that the documents should enjoy work-product immunity. The documents in question appear to have been generated for purposes other than to assist in preparation for litigation; they are more in the nature of records of facts and statistics, or updates of claims status, costs and exposure, than the traditional work-product of attorneys (see discussion above concerning nature of documents). In any event, even if the documents were to fall under the rubric of privileged attorney work-product, plaintiffs manifest a compelling need to obtain discovery. As previously discussed, communications evidencing Keene's knowledge concerning the prospects of litigation and Keene's economic exposure therefrom, go to the crux of the case plaintiffs hope to present. As already noted, Keene's views as to its litigation prospects were informed by, and perhaps even wholly dependent upon, the information provided by counsel. Despite counsel's glib declaration that the information sought is procurable elsewhere if plaintiffs work just "a bit harder" than they wish (Def.Mem. at 11), it is not readily apparent, and counsel does not suggest, from what source plaintiffs can gain access to the substance of these communications at all, much less "without undue hardship." *See In re LTV Securities Litigation*, 89 F.R.D. 595, 612–13 (N.D.Tex.1981); *Condon v. Petacque*, 90 F.R.D. 53, 54–55 (N.D.Ill.1981) (noting that the burden of showing substantial need is lessened the farther the material is from the attorney's mental processes or impressions). Hence, the attorney work-product privilege will not immunize the documents from discovery.

### Plaintiffs' Subpoena Upon AKOO

Keene objects to plaintiffs' document demands upon AKOO on the additional ground that production poses an unreasonable burden.[9] Plaintiffs' requests are charac-

---

9. Keene claims this burden is particularly unjustified in view of the fact that plaintiffs already possess documents indicating the conclusions reached by AKOO concerning Keene's asbestos-related exposure during the relevant period. Keene presented these few documents for examination in the hope of persuading the Court to reconsider its Order as regards production from AKOO. The documents in question are three letters from AKOO to Keene's accountants, Arthur Anderson, two letters from Keene to Arthur Anderson concerning the impact of asbestos cases, and one page of jotted notes from a Bairnco outside director concerning a meeting with AKOO. After examination of these documents, we are not dissuaded from directing AKOO to comply with the Court's October Order. The letters from AKOO to Arthur Anderson, drafted ostensibly for the purpose of preparing financial statements (*see* Beatie Aff.Exh. C), are virtually identical and contain only a brief discussion of asbestos case activity. The conclusions reached, and much of the basis for them, are replicated verbatim in the Bairnco disclosures alleged to be materially false and misleading. The two letters from Keene to Arthur Anderson, (which are referenced in the AKOO letters and seem to have comprised the basis for the conclusions expressed therein) provide a substantially more detailed analysis, but are not indicative of any independent evaluation by AKOO and are thus not the types of "definitive opinion letters" reflecting "thorough consideration [by AKOO] of all the litigation pending and the prospects in that litigation" that the Court sought. Tr. of Ct.Conf. at 25. These documents are not sufficient to convince us that, in a case alleging fraud in the disclosure of Keene's asbestos-litigation

terized by counsel from AKOO as overbroad and ambiguous. Warshauer Aff. at 10. The subpoena served upon AKOO does indeed demand items that fall beyond the reach of the Court's October Order. That Order, as it relates to AKOO, only directs production of communications from AKOO to Keene concerning the prospects of any litigation against Keene seeking damages in connection with the sale of asbestos products and Keene's economic exposure in connection therewith. This includes documents relating to the ACF or CCR that contain information pertaining to Keene's liability as a member of either facility or otherwise reflecting on Keene's economic exposure.[10] To the extent plaintiffs' subpoena requests other "potentially relevant" items (Pl.Mem. at 11) outside the scope of the Court's Order, those requests may be disregarded. This should ease the burden of which Keene's counsel complain.

■ Counsel from AKOO also seeks guidance as to whether production will require review of case-specific files. Warshauer Aff. at 2. Because the Court's Order requires production of communications concerning the prospects of *any* litigation, case-specific files must be reviewed, particularly for documents regarding the impact one case may have on the posture or prospects of other cases and on Keene's broader economic exposure. However, this should not be unduly burdensome if a separate folder of correspondence with the client was kept. In any event, we think the highly probative nature of the documents sought justifies the burden.[11]

Keene also asserts the same privileges or immunities for the documents demanded from AKOO as it has for the items ordered produced by Keene. Consequently, AKOO is

permitted sixty days from the date of this Order to submit the documents claimed to be privileged for *in camera* review by the Court under the principles discussed at length above. In addition, all other documents falling within the Court's October Order that are not claimed to be privileged must be produced to plaintiffs by that date. Finally, to the extent AKOO expresses concerns regarding confidentiality, the Court remains willing to issue an appropriate order to protect the documents from broader disclosure.

### Plaintiffs' Subpoena Upon M & E

■ Plaintiffs' document request upon M & E was identical to the one served upon AKOO. However, it appears M & E never served as corporate counsel to Keene during the relevant period and may not hold any documents responsive to the Court's Order.

M & E did not represent Keene in any capacity until September, 1985 when it became one of many law firms to serve as counsel to the ACF. Berry Aff. at 2. When the ACF was dissolved in October 1988 and subsequently replaced by the CCR, M & E served as one of the counsel for the CCR until its discharge in August 1989. *Id.* at 3. During the September 1985 to August 1989 period, M & E served as ACF/CCR counsel in New Jersey, Eastern Pennsylvania, Delaware and the Virgin Islands. *Id.* M & E's representation of Keene, during this period, was limited to the firm's representation of the ACF/CCR, as attested by counsel from M & E:

At no time did [M & E] act as individual corporate counsel to Keene and, at no time, were we called upon by Keene to opine about the extent of Keene's corporate liability arising out of the asbestos personal injury or property damage litiga-

economic exposure, plaintiffs should be prevented from uncovering further the types of information and opinions going from Keene's asbestos-counsel to Keene.

10. Plaintiffs' counsel apprises the Court of the fact that Keene's liability as a member of the ACF and the CCR was determined as a fixed percentage of the costs of all bodily injury cases, regardless of whether a claimant had alleged exposure to a Keene asbestos product or specifically named Keene as a defendant. Pl.Mem. at 66.

11. We note that this may be true from the perspective of *both* plaintiffs and defendants. The documents sought may contain information essential to central elements of plaintiffs' case; conversely the search may reveal a lack of evidence that casts a doubt on the basis for the conclusions alleged to be fraudulent—a fact that could well serve defendants, who have already requested leave to move for summary judgement.

tion. *As a result we have no documents in our files responsive to plaintiff's request for the period from September, 1985 to August 30, 1989.*

(emphasis added). Berry Aff. at 3. We think these representations sufficient to quash plaintiffs' document requests upon M & E; the firm will not be required to comply with the Court's October Order.

▇ It appears that M & E also became trial counsel to Keene subsequent to the end of the class period in the instant litigation. Pl.Mem. at 64. On that basis, plaintiffs explore the possibility of obtaining documents from M & E "written to date that reflect on relevant events that took place" prior to the date of the allegedly fraudulent disclosures. Tr. of Ct.Conf. at 22–24; Pl.Mem. at 64, 67–68. Documents prepared after the date of the disclosures in question appear too unlikely to contain probative evidence concerning the types of information and assessments that were previously provided by counsel to Keene during the relevant period to justify permitting this inquiry. Consequently, the fact that M & E may have become Keene's trial counsel after the date of allegedly fraudulent disclosures does not provide a basis for plaintiffs to serve M & E with document requests. In short, M & E is entirely excused from production.

### CONCLUSION

For the foregoing reasons, Keene's motion to reconsider or modify the Court's October 30, 1992 Order is granted to the extent that the matter has been reconsidered, but is otherwise denied. Keene is given ten days from the date of this Order to file a petition for writ of mandamus. Otherwise, Keene is ordered to produce to plaintiffs, promptly after such ten-day period, the eleven documents within its possession directed to be produced pursuant to the Court's *in camera* review and, within sixty days after the date of this Order, Keene's counsel AKOO shall produce all other documents falling within the Court's October 30, 1992 Order, except for those documents claimed to be privileged, which shall be submitted to the Court for *in camera* review. Only documents that antecede the date of the disclosures alleged to be

fraudulent need be produced. Plaintiffs' document request upon Keene's counsel M & E is quashed.

SO ORDERED