**In re KIDDER PEABODY SECURITIES LITIGATION.**

No. 94 Civ. 3954 (BSJ).

United States District Court, S.D. New York.

May 16, 1996.

Memorandum Clarifying Decision
May 29, 1996.

Richard Bemporad, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, Robert C. Schubert, Schubert & Reed LLP, San Francisco, CA, for Frank W. Knisley.

Richard Bemporad, Lowey Dannenberg Bemporad & Selinger, P.C., White Plains, NY, for IRA, Ira M. Newman, Edward A. Snell.

Mark C. Rifkin, Greenfield & Rifkin, LLP, Ardmore, PA, for Estelle Steinberg, Sharon Roxin.

Robert F. Wise, Jr., Davis Polk & Wardwell, New York City, for Kidder Peabody & Co., Inc.

David M. Brodsky, Schulte Roth & Zabel, New York City, Daniel Jonathan Kramer,

Schulte Roth & Zabel, New York City, for Michael A. Carpenter.

Raymond Banoun, Cadwalader, Wickersham & Taft, New York City, Earl Nemser, Cadwalader Wickersham, New York City, for Richard W. O'Donnell.

Kenneth E. Warner, Lewis S. Fischbein, Coblence & Warner, New York City, for Joseph Jett.

Henry B. Gutman, Simpson Thacher & Bartlett, New York City, for Edward A. Cerullo.

### MEMORANDUM & ORDER

DOLINGER, United State Magistrate Judge:

This shareholder securities litigation is an outgrowth of an announcement by defendant Kidder Peabody on April 17, 1994 that it had just discovered that one of its most prominent traders, Joseph Jett, had swindled Kidder. According to Kidder, Jett had perpetrated a highly profitable fraud by engaging in a money-losing pattern of trades in government securities while creating on Kidder's bookkeeping system a record of phantom profits that had supposedly totalled hundreds of millions of dollars over a 28–month period. By doing so, Kidder alleged, Jett had induced the company to pay him millions of dollars in bonuses.

Since the alleged scheme by Jett had caused Kidder substantially to overstate its earnings during the relevant period, shareholders quickly filed suit against both Kidder and Jett[1], as well as separately against Kidder's parent, the General Electric Company ("GE"). Although the complaint against GE has been dismissed, we are in the midst of substantial discovery in this surviving class action, and that process has predictably led to several disputes concerning the production of documents.

The principal conflict concerns the refusal of Kidder to produce a quantity of attorney notes and memoranda reflecting numerous interviews conducted for Kidder by its current trial counsel, the law firm of Davis, Polk & Wardwell. Kidder asserts that these doc-

---

1. Plaintiffs have also named three of Jett's supervisors as defendants.

uments are work product and that some are also protected by the attorney-client privilege. The class plaintiffs and co-defendant Jett argue that the documents were not prepared in contemplation of litigation, and that any protection has been waived by the public release of an investigative report by the Davis Polk firm in which counsel summarized their factual findings and recommendations for reform to Kidder, as well as by Kidder's use of that report for litigation purposes. Plaintiff and Jett also urge that a further waiver may be implied from Kidder's production in discovery of a draft of the report as well as copies of some interview documents. Finally, the class plaintiffs contend that Kidder cannot withhold the documents from GE's shareholders, to whom the company owes a fiduciary duty.

In addition to this matter, plaintiffs and Jett seek production of several other, if narrower, categories of documents from Kidder. Plaintiffs and Jett also seek identification of any individuals interviewed by Kidder's attorneys since issuance of the report.

Finally, Jett has withheld notes created by his attorney during his appearances at the Securities and Exchange Commission and the United States Attorney's Office, contending that these, and subsequently created summary memoranda, are work product. In response Kidder presses the notion that it should be entitled to their production if the Davis Polk notes and memoranda are deemed not to be protected.

At the invitation of the court, the parties have briefed these disputes, which I now address separately.

## ANALYSIS

### A. *The Kidder Interview Documents*

Kidder has identified notes and memoranda reflecting approximately 120 interviews of 65 of its present or former employees. These interviews were conducted by Davis Polk attorneys after the firm had been retained by Kidder in April 1994 to perform legal services for it. Among the services performed by Davis Polk have been (1) the representation of Kidder in a variety of proceedings that evolved from the discovery of Jett's alleged misconduct and (2) the preparation of an 85–page report for Kidder summarizing in detail the facts uncovered by the law firm in the course of its investigation of Jett's transactions and conveying various recommendations to Kidder for reform of its methods of supervision to ensure against a repetition of these events.

As noted, Kidder asserts that these notes and memoranda are protected from production as work product and that some are covered by the attorney-client privilege. Plaintiff and Jett argue that, to the extent that these documents reflect statements made by the interviewees, they should be produced. I conclude that those portions of the documents are discoverable.

### 1. *Work Product*

The work-product doctrine is embodied in Fed.R.Civ.P. 26(b)(3), which offers qualified immunity from discovery for documents "prepared in anticipation of litigation or for trial." *See, e.g., Bowne of New York City, Inc. v. AmBase Corp.,* 150 F.R.D. 465, 471 (S.D.N.Y.1993). To invoke the protection of the rule, the party resisting discovery bears the burden of establishing that the documents in question were "prepared principally or exclusively to assist in anticipated or ongoing litigation." *United States v. Construction Prods. Research, Inc.,* 73 F.3d 464, 473 (2d Cir.1996). *See also id.* (party invoking rule bears the burden of proof).

Even if the document comes within the scope of the rule, the protection afforded is conditional and "may [therefore] be set aside if the discovering party demonstrates a sufficiently pressing need for the data." *Bowne,* 150 F.R.D. at 471. That standard requires proof that the inquiring party "has [a] substantial need of the materials in the preparation of [its] case and that [it] is unable without undue hardship to obtain the substantial equivalent of the materials by other means." Fed.R.Civ.P. 23(b)(3). *See, e.g., Horn & Hardart Co. v. Pillsbury Co.,* 888 F.2d 8, 12 (2d Cir.1989).

Application of these standards demonstrates that Kidder's invocation of the work-product rule to protect factual summaries of statements made by interviewees cannot stand. Specifically, Kidder has failed to

sustain its burden to demonstrate that the documents at issue were created principally or exclusively to assist in contemplated or ongoing litigation.[2]

We start with the purposes for the creation of the interview documents. In supporting affidavits, Kidder's general counsel, John M. Liftin, Esq., and Davis Polk partner Gary Lynch, Esq., recite in largely identical terms that within days after discovering a problem in Jett's transactions, Liftin approached Lynch and requested that he and his firm represent Kidder in all litigation and other proceedings that could be anticipated to arise in connection with this matter. According to both men, Lynch and his colleagues at the firm accepted this assignment, and as one of their first steps they undertook an intensive fact-finding investigation to determine what had occurred and why, so as to permit them to defend Kidder's legal interests in expected arbitrations and SEC proceedings, as well in anticipated shareholder lawsuits. (*See* Affidavit of John M. Liftin, sworn to Mar. 19, 1996, at ¶¶ 3–12, 14–16, Affidavit of Gary G. Lynch, sworn to Mar. 19, 1996, at ¶¶ 2–9, 11, 14.)

Those proceedings were quick to commence, with the first being an arbitration application filed within days by Davis Polk on behalf of Kidder against Jett before the New York Stock Exchange. Jett in turn commenced an arbitration proceeding against Kidder before the NASD, and both the SEC and the United States Attorney's Office opened investigations. In addition, the present shareholder suit was commenced against Kidder in this court and a parallel suit was filed against GE. There is no dispute that Davis Polk has represented Kidder in all of these proceedings. (*See* Liftin Aff. at ¶¶ 5, 12, 14; Lynch Aff. at ¶¶ 4, 11.)

This is not the entire story, however. In their affidavits, Messrs. Liftin and Lynch do not directly allude to the question of whether, at the time of his retention, Lynch was also asked to prepare a detailed report re-

counting and assessing these events, together with recommendations for institutional reform by Kidder. Indeed, the only reference in the two affidavits to the role of such a report is found in the penultimate or closing paragraph of each affidavit, in which the two affiants state, in identical terms, that the so-called Lynch report was "not publicly disclosed by Kidder in order to secure any advantage in this litigation or in any other litigation or investigation" (Liftin Aff. ¶ 16; Lynch Aff. ¶ 15), but rather "to answer legitimate questions from the press, the public, Kidder's customers and counterparties and GE's shareholders as to how the Jett scheme was perpetrated and why it remained undiscovered until April 1994." (Liftin Aff. ¶ 16; Lynch Aff. ¶ 15).

Since the documents currently at issue refer to interviews that Davis Polk conducted in the course of preparing the report as well as in preparing for litigation, we cannot determine whether those documents were created "principally for litigation", as Kidder contends, without assessing the importance of the report to Kidder when it retained the law firm. On this issue, Kidder's affiants offer no meaningful evidence. Instead, Kidder simply parrots the legal standard that the interviews were conducted principally as an aid to litigation.

The balance of the record tells a somewhat different story. On April 17, 1994, one day after hiring Mr. Lynch and his firm, Kidder publicly announced the discovery of the scheme and Mr. Jett's termination, and issued a press release insisting that this was an isolated occurrence. At the same time, it announced the retention of Mr. Lynch, whom it described as "former head of enforcement at the Securities and Exchange Commission", and reported that his role was "to lead a comprehensive investigation into what went wrong and to recommend steps to prevent a recurrence." (*See* Letter of Richard Bemporad, Esq., dated April 2, 1996, at Exh. B).[3]

---

**2.** In view of this conclusion, I do not address plaintiffs' and Jett's waiver arguments in connection with the work-product claim or Jett's assertion of a particularized need for the documents. Waiver does become a crucial issue in assessing

Kidder's invocation of the attorney-client privilege for some of the same documents.

**3.** GE also noted that its own Treasurer would work on the investigation. *Id.*

These announcements began an extended public relations effort by Kidder and GE to communicate the message that they were not directly at fault, and that they were not only cooperating with law enforcement investigations, but also pursuing their own inquiry to determine the cause of the problem. Thus, for example, on April 29, 1994 the New York Times published a story based on interviews with senior Kidder officials, in which those individuals recounted Kidder's efforts to assist the SEC and the United States Attorney, but also emphasized that Kidder was pursuing its own investigation, headed by Mr. Lynch, who was described as an "outside lawyer," and that Kidder was also conducting internal audits in conjunction with the Lynch inquiry "to reconstruct what happened." According to a Kidder official, the real object of the Lynch investigation was to determine "why did it take so long to find out? . . . Why didn't we catch it sooner, when it was smaller?" Consistent with the theme of openness and cooperation, Kidder's general counsel, Mr. Liftin, reported that the conclusions of the Lynch investigation would be shared with the SEC and "would probably be made public." (Bemporad Letter at Exh. C).

Similar stories were published in other key media outlets. For example, on May 2, 1994, Business Week ran an article based explicitly on interviews with the Chief Executive Officers of Kidder and GE, both of whom pressed the notion that Kidder had not been at fault, although a few supervisors at Kidder may have been less than vigilant. Again, they emphasized the significance of the Lynch investigation as the means by which GE and Kidder were seeking to determine how the scheme had gone undetected for so long, and GE's CEO affirmed that Lynch's "findings . . . could lead to further action against employees or their supervisors." (Id. at Exh. D). Subsequent reports announced the replacement of Kidder's CEO, a move that the GE Chief Executive Officer described as necessary to reassure customers and competitors, despite the fired executive's assertedly fine performance, because "perception can become reality." (Id. at Exh. G).

On or about August 2, 1994, Kidder transmitted a draft of the Lynch report to the SEC, together with a letter asking the SEC for its comments and suggestions for final revisions. (See Affidavit of Lewis S. Fischbein, Esq., sworn to April 9, 1996, at ¶ 11 & Exh. G.) The record is silent as to whether the Commission made any such suggestions.

Finally, on August 4, 1994, the official date of completion of the Lynch report, GE released it to the public, accompanied by an announcement of personnel actions and institutional changes designed to carry out reforms suggested by the report. In doing so, the new Chief Executive Officer of Kidder stated: "The Lynch report made it clear that this scheme was the work of one employee, acting alone, using an elaborate scheme to conceal his real losses and the magnitude of his trading positions. It also identifies the human and system failures that allowed the scheme to go undetected for such a long period. We have learned much from the Lynch report, and we have already implemented many of its recommendations. The others will be implemented as soon as practical." (Bemporad Letter at Exh. F).

In an apparently contemporaneous interview, Mr. Lynch confirmed that the preparation of this report had been an essential part of his role in representing Kidder. Thus, he was quoted as saying "From Day 1, our mandate was to get to the bottom of this and call it the way we saw it." (Jett Media Chart at Exh. 14). Again, in a subsequent letter to Business Week, Lynch reported, "My only mandate . . . was to give my best assessment of what happened and why, based on the facts I found." (Id. at Exh. 17).

This characterization of the focus of Lynch's retention and investigation echoed the public position of Kidder itself. Apart from the comments of its officials to the press, the company made essentially the same point to others. Thus, in a letter of reprimand dated August 3, 1994 and addressed to one of its employees, Kidder reported that it had retained Davis Polk on April 15, 1994 "to conduct an independent investigation of the facts and circumstances pertaining to the phantom profits generated by the trading activities of Joseph Jett. Counsel was asked to determine how the events occurred, how the scheme was allowed

to continue for as long as it did, and how to prevent similar problems from recurring." (*Id.* at Exh. 11).

This congeries of evidence and a dose of common sense lead us to several conclusions that are pertinent to the work-product question. First, we have no reason to doubt Kidder's representation that it chose to hire Davis Polk to represent it in all impending lawsuits, arbitrations and agency investigations. Moreover, in order to prepare to represent Kidder in these fora, Mr. Lynch and his colleagues were obliged to undertake a thorough investigation of the events at issue, which in turn required interviews of large numbers of potential witnesses and the creation of notes and memoranda summarizing what the interviewees had told counsel. We may also infer that these steps would have been taken even if Kidder had had no interest in retaining Davis Polk to conduct an inquiry and prepare a report for purposes of institutional reform or public relations.

Second, it is plain beyond cavil that when Kidder hired Mr. Lynch, it did so in part for the specific purpose of having him conduct an internal inquiry in order (1) to find out what Jett had done and why it had taken so long to discover the wrongdoing, and (2) to prepare a report summarizing his factual conclusions in detail and making recommendations for corrective action by Kidder. Indeed, this point was explicitly and repeatedly made by the Chief Executive Officers of GE and Kidder at the very time that they announced Lynch's retention and frequently thereafter up to the time that the report was released for public consumption. It has also been confirmed by Lynch, and is thus not a matter in meaningful dispute.

Third, and most crucial for our purposes, we conclude that Kidder would have hired outside counsel to perform such an inquiry even if no litigation had been threatened at the time. From a perusal of the public record, it is painfully evident that the Jett scandal presented Kidder not only with a serious legal problem, but with a major business crisis. The initial financial problem involved a correction of more than $200,000,000.00 in Kidder's reported profits, but far more serious was the danger of a perception in the financial markets that Kidder might not survive or could at least lose its competitive position. This danger flowed not only from the fact that Kidder's then-current financial position was less potent than previously believed, but from the very real prospect that if Kidder were indeed significantly responsible for the misconduct, it could—like the recently dissolved Drexel firm—face potentially ruinous liabilities. In addition, and perhaps equally serious, if Kidder did not convey the impression that it was acting vigorously to correct whatever weaknesses had led to the scandal, it would face a serious loss of public confidence in its general competence, reliability and honesty. (*See* Bemporad Letter at Exhs. E & G).

These concerns could not be addressed merely by hiring a team of attorneys to litigate the complex factual and legal issues, in the hope that Kidder would eventually be vindicated. As the financial press reported at the time, competitors were immediately interested in luring away Kidder's best traders and customers, (*see, e.g.,* Jett Media Chart at Exh. 6), and Kidder thus had a very pressing interest in promptly assuring the public as well as government regulators and its own personnel that it was not in any way responsible for Jett's fraud and was, indeed, anxious to take the lead in ferreting out the facts.

In this context, the reasons for the selection of Mr. Lynch and the determination of the role that he was to play become quite clear. Mr. Lynch is the former Director of Enforcement at the SEC and apparently has a reputation in the securities industry for probity and a commitment to the stringent enforcement of the securities laws. Combined with his connection to a prestigious law firm, this background undoubtedly made him an ideal choice for Kidder and GE if, as seems obvious, they were concerned to convey the public impression not only of factual innocence, but of their determination to root out any wrongdoing.

This same concern for public perception presumably made it vital to GE and Kidder that Lynch and his colleagues be assigned not merely the task of defending them in the courts or before arbitration panels or regula-

tory agencies, but also the role of actively investigating the circumstances of the wrongdoing, reporting their findings and making corrective recommendations. Indeed, if anything, this was the more crucial role to be played by outside counsel in these circumstances. The point is that, in contrast to many situations in which a private corporation finds it necessary to conduct an internal investigation because of concern about possible wrongdoing and consequent litigation and liability, Kidder's unique public profile and its vulnerability to the ebb and flow of market opinion and the predations of its competitors made it urgent that the internal investigation be well publicized and viewed as the inquiry of an "independent" and incorruptible outsider.

Not surprisingly, then, the public pronouncements of GE and Kidder from the day on which they announced the hiring of Lynch focussed almost exclusively on the assignment of "independent" counsel to investigate the events in question, to determine who was responsible and to make recommendations to Kidder for corrective action. Moreover, GE's Chief Executive Officer explicitly noted his concern about public perceptions of Kidder's situation, and appeared very clearly to acknowledge the obvious—that the course of action selected by GE and Kidder was designed to sway such perceptions. The decision to release the report appears, in retrospect, to have been virtually a foregone conclusion from the outset since this was a crucial aspect of Kidder's public relations strategy.

Based on these conclusions we find that the interviews conducted by Lynch and his colleagues were not undertaken "principally" to assist in contemplated or ongoing litigation.[4] A detailed and painstaking inquiry was required for pressing business purposes and thus would have been undertaken regardless of whether litigation was threatened. Although the converse was presumably also true—that is, the same interview campaign might well have been conducted even in the absence of any non-litigation concerns—these twin inferences demonstrate that litigation was not the "principal", or dominant, motivator, but rather was, at most, an inducement equivalent in importance to the business necessities that we have already cited. It follows, then, that the notes and memoranda of the interviews, insofar as they simply recounted witness statements, were created as much for their use in serving Kidder's business needs as for their utility in preparing for litigation.[5] Since the standard governing work-product claims requires Kidder to demonstrate that the documents in question were prepared "principally" if not exclusively for litigation purposes, it has not sustained its burden.

It also bears emphasis that even, if this "but for" analysis were not the appropriate tool for determining the relative significance of multiple purposes for the creation of a document, the result here would be the same. As we have noted, at the time that GE and Kidder hired Lynch, the most pressing concern appears to have been to convey at the outset to interested segments of the public—including customers, traders, competitors and regulators—the clear impression that Kidder had not connived in the wrongdoing, that it was intent on discovering what had occurred and sanctioning those responsible, that it would promptly correct any institutional problems, and, by implication, that it would survive the crisis and continue to compete aggressively in the market. The hiring of Lynch and the announced investigation, together with the subsequent release of the report were obviously crucial components of this strategy, and in this context the conducting of the interviews and preparation of summaries was, if anything, more immediately important to Kidder for this purpose than for the arbitrations and litigations that were to follow.

In assessing Kidder's position on this issue, I have noted that the proffered affidavits from Kidder add little if anything. Its only

---

4. Quite obviously the interviews were not conducted exclusively for litigation purposes.

5. It is entirely possible that among the withheld documents are memoranda discussing litigation strategies. Obviously these would fall within the category of work product, a proposition not contested by plaintiffs or Jett.

direct response is in the form of a belated letter from trial counsel, who suggests that if Kidder had been interested only in conducting an internal inquiry for institutional reform purposes, it would have undertaken a much more circumscribed investigation, and thus, by implication, might not have hired Lynch or required him to interview 65 people. (*See* April 24, 1996 letter to the court from Robert Wise, Esq.). There are several responses to this assertion.[6]

First, the letter is simply not competent evidence on what is an issue of fact. Kidder has the burden to prove the factual underpinnings of its work-product claim and must do so by competent evidence. *See, e.g., Construction Prods. Research, Inc.*, 73 F.3d at 473; *von Bulow v. von Bulow*, 811 F.2d 136, 144 (2d Cir.), *cert. denied*, 481 U.S. 1015, 107 S.Ct. 1891, 95 L.Ed.2d 498 (1987). A letter from trial counsel cannot substitute for testimony by the relevant decision-makers at Kidder or GE representing under oath or penalty of perjury that they would not have authorized such a wide-ranging investigation by outside counsel but for the need to prepare for imminent litigation. *See, e.g., Bowne*, 150 F.R.D. at 472. *Cf. Randell v. United States*, 64 F.3d 101, 109 (2d Cir.1995) (attorney statements made without showing of personal knowledge held inadequate to defeat motion for summary judgment).

Second, such an assertion would in any event be wholly implausible. For the reasons already noted, business considerations were apparently driving Kidder and GE to hire a distinguished outside attorney to conduct an in-depth inquiry and to publicize that effort, and those concerns were entirely independent of the need to prepare for litigation. To have chosen to use only in-house personnel to conduct the investigation or to have foreshortened it would have sabotaged the very goals that Kidder and GE were plainly pursuing at the time, and we have no reason to believe that they would have undertaken such a shortsighted approach to the problems that they were confronting.

In sum, the interview documents, insofar as they embody summaries of what the interviewees said concerning the Jett transactions and related matters, are not protected by the work-product rule.[7]

### 2. *Attorney–Client Privilege*

Some of the so-called interview documents are said to be protected by the attorney-client privilege of Kidder. Specifically, Kidder invokes the privilege to cover interviews of individuals who were employed by Kidder at the time of the interview.

Plaintiffs and co-defendant Jett oppose the invocation of the privilege for the interview documents on a variety of grounds. First, they argue that Kidder has waived the protection of the privilege by both the public disclosure of the Lynch report, which appears to embody or rely upon many of the witness statements, and Kidder's affirmative use of the report in this litigation and in other related proceedings. Second, Jett argues that he has a compelling need for the interview documents. Third, plaintiffs assert that the so-called fiduciary exception to the attorney-client privilege precludes Kidder from withholding the documents from the shareholders of its parent. Fourth, plaintiffs argue that Kidder waived the privilege by producing some of the documents in discovery and by turning over a draft of the report to the SEC.

---

6. Kidder also emphasizes that, as a legal matter, the term "in contemplation of litigation" has been liberally construed. (Wise Letter at 1) (citing *New York v. Mid Hudson Medical Group, P.C.*, 877 F.Supp. 143, 150 (S.D.N.Y.1995)). This is true but irrelevant. The cited cases address the question of how imminent or likely as-yet unfiled litigation must be for the work-product rule to apply. *See, e.g., United States v. Adlman*, 68 F.3d 1495, 1501–02 (2d Cir.1995). That is not an issue here, since the first arbitration was filed by Davis Polk within days of its retention, and other proceedings quickly followed. The inapplicability of the work-product rule follows, rather, from the existence of pressing non-litigation reasons for the creation of the interview documents both before and after commencement of litigation.

7. In view of this conclusion, we need not assess the argument that public disclosure of the report, its use by Kidder in this and other litigation contexts and production in this lawsuit of some interview materials constituted a waiver of work-product protection. These issues will recur, however, in connection with our assessment of Kidder's invocation of the attorney-client privilege.

### a. Standards for Privilege and its Waiver

■ We start by noting the currently accepted standards for recognition of the privilege in federal-question litigation.[8]

> To invoke the attorney-client privilege, a party must demonstrate that there was: (1) a communication between client and counsel, which (2) was intended to be and was in fact kept confidential, and (3) made for the purpose of obtaining or providing legal advice.

*Construction Prods. Research, Inc.*, 73 F.3d at 473 (citing cases). *See also In re Grand Jury Subpoena Duces Tecum*, 731 F.2d 1032, 1036 (2d Cir.1984) (quoting *United States v. Bein*, 728 F.2d 107, 112 (2d Cir.1984)). On its face the affidavit of Mr. Lynch appears to satisfy these standards (*see* Lynch Aff. at ¶¶ 5, 9–11), and neither plaintiffs nor co-defendant Jett seriously quarrel with that conclusion. *See generally Upjohn Co. v. United States*, 449 U.S. 383, 389–96, 101 S.Ct. 677, 682–86, 66 L.Ed.2d 584 (1981). Rather, they focus principally on issues of waiver, including related concerns about fairness in the specific circumstances of this case.[9] I address those matters *seriatim.*

■ The attorney-client privilege is waived if the "holder of the privilege voluntarily discloses or consents to disclosure of any significant part of the matter or communication." Sup.Ct.St. 511. *See, e.g., Westinghouse Elec. Corp. v. Republic of the Philippines*, 951 F.2d 1414, 1424 (3d Cir.1991) (citing cases). *See generally* 2 Jack B. Weinstein & Margaret A. Berger, *Weinstein's Evidence* ¶ 511[02] at 511–4 to –8 (1990). Waiver may take place even if the disclosing party does not "intentionally relinquish[ ] a known right." *Id.* at 511–6 to –7 & nn. 14–16. *Accord, e.g., In re Sealed Case*, 676 F.2d 793, 823 (D.C.Cir.1982); *In re John Doe Corp.*,

675 F.2d at 488–89. "If he voluntarily undertakes actions that will predictably lead to the disclosure of the document, then waiver will follow." *Bowne*, 150 F.R.D. at 479 (citing *In re von Bulow*, 828 F.2d 94, 100–01 (2d Cir. 1987)).

In this case plaintiffs and Jett point to at least two actions of Kidder that are said to have waived the privilege for the underlying interview documents. First, Kidder released the final Lynch report to the public, and since that document contains not only a factual summary based on the interview documents, but explicit paraphrases from the interviews, plaintiffs assert that they are entitled to the complete interview summaries. Second, Jett and plaintiffs document the fact that Kidder has made repeated and extensive use of the Lynch report not only in this litigation, but also in the arbitrations and in connection with the investigations by the SEC and the United States Attorney. They argue that such "partial disclosure" is fundamentally unfair since Kidder is in effect relying on Lynch's characterization of a factual record embodied in the interview documents, and that this implicit reliance on the underlying documents justifies their demand for production of the undisclosed record.

It is conceded that Kidder has not disclosed the interview documents themselves[10] and that the Lynch report, which it has disclosed, contains only a series of allusions to the witness statements. Thus, we are required to assess the extent to which Kidder's handling of the Lynch report has operated as an implied waiver of protection for documents that have not themselves been revealed.

The starting point for our assessment of the scope of implied waiver is the analysis of the Second Circuit in *In re von Bulow*, 828

---

**8.** Since plaintiffs are asserting federal claims, federal law defines the substance of the privilege. *See* Fed.R.Evid. 501.

**9.** Given the uses to which the Lynch report has been put, one might fairly question whether, at the time of the creation of the interview documents, there existed a sufficient intention to treat the conversations that they memorialized as confidential. Since, however, the analysis is more straightforward if we address the issue in the

context of plaintiffs' and Jett's waiver argument, *cf. In re John Doe Corp.*, 675 F.2d 482, 488 (2d Cir.1982), we need not address that precise question.

**10.** Plaintiffs do argue that a few possibly privileged documents were produced in discovery. Kidder contends that any such production was inadvertent. (*See* Wise April 24, 1996 Letter at 7).

F.2d at 100–03. At issue in that case was the effect on the privilege from the publication of a book by von Bulow's counsel, in which the attorney described portions of certain privileged conversations with his client. The client's wife sought disclosure of the balance of the conversations that had been partially disclosed, as well as discovery of all other privileged conversations on the same topics. *Id.* at 96.

In substance, the circuit court held that the scope of any waiver by virtue of disclosure was to be defined by the so-called "fairness doctrine", which "aim[s] to prevent prejudice to a party and distortion of the judicial process that may be caused by the privilege-holder's selective disclosure during litigation of otherwise privileged information." *Id.* at 101. Thus, the extent of any waiver by implication turns on the circumstances of the disclosure. Since the disclosure in *von Bulow* had occurred in an "extrajudicial" setting—by publication of a book—the court there held that the unfairness to which the waiver doctrine was addressed was not implicated. As a result, the publication waived the privilege only with respect to the particular communications or portions of communications actually disclosed. *Id.* at 103 (holding that matters actually disclosed in public lose their privileged status because the "cat is let out of the bag.")

Both dictum in *von Bulow* and a substantial body of other case law support the obverse conclusion, that disclosure in a "judicial" setting does trigger a waiver by implication for related and otherwise privileged materials. The waiver may include both the entirety of communications that a party has disclosed only in part and all other privileged communications insofar as they touch upon subjects voluntarily disclosed by the privilege holder. *See, e.g., id.* at 101–03; *Bowne*, 150 F.R.D. at 484–85 (citing cases). As summarized in an earlier decision:

> The prototypical unfairness suggested by the Court [in *von Bulow* ] would be a

misleading pattern of disclosure, in which the privilege holder releases only communications or portions of communications favorable to his litigating position, while withholding any unfavorable ones. [*von Bulow*, 828 F.2d] at 102. Alternatively, if the privilege holder puts those communications in issue by virtue of his claims or defenses in the case, then a broader, so-called "subject matter" waiver should also be recognized. *Id.* at 102–03. *See also United States v. Bilzerian*, 926 F.2d 1285, 1291–94 (2d Cir.), *cert. denied*, [502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39] (1991).

*Bowne*, 150 F.R.D. at 484.

#### b. *The Waiver Analysis*

As noted, plaintiffs and defendant Jett cite both the public release of the Lynch report and Kidder's use of the report to assist its position in various litigation contexts, including this and the parallel GE suit, the various arbitrations and the investigations undertaken by the SEC and the United States Attorney.[11] These two arguments trigger somewhat different conclusions.

The public release of the Lynch report is functionally indistinguishable from the book publication in *von Bulow*. Both unquestionably involve "extrajudicial" disclosures. Accordingly, we are constrained by *von Bulow* to conclude that issuance of the Lynch report constitutes a waiver of the privilege only for the communications or portions of communications disclosed in the report, 828 F.2d at 102 (waiver found "as to the particular matters *actually disclosed* " but "extrajudicial disclosure ... does not waive the privilege as to the undisclosed portions of the communication"), and does not justify compelled production of interview documents that might disclose other information merely because those documents may have been considered by the authors of the report.

In practical terms this means that Kidder's waiver by publication requires disclosure of those portions of the interview documents that are specifically alluded to in the Lynch

---

11. Plaintiffs also suggest that Kidder may have engaged in a form of misleading disclosure in the sense that the Lynch report mischaracterizes what the interviewees said. We cannot assess such an argument without an *in camera* review of the underlying documents, an exercise that is unnecessary in view of our conclusion that Kidder has in any event waived the privilege.

report. In this regard I reject Kidder's apparent argument that because the Lynch report does not directly quote from any of the interview statements, there has been no disclosure sufficient to trigger a waiver. In a number of instances the report offers a very specific purported paraphrase of statements made by witnesses in the course of arguably privileged communications. *See, e.g.,* Lynch Report at 52–54, 66–68, 78–82. Disclosure of the substance of a privileged communication is as effective a waiver as a direct quotation since it reveals the "substance" of the statement. Necessarily, then, the release of the Lynch report does operate to waive the privilege to this extent.

■ We need not pause to determine the specific impact of this conclusion, however, since we further conclude that the balance of the factual portions of the interview documents also must be disclosed. This follows from the fact that Kidder has waived the privilege by its repeated injection of the substance of the report into this and other litigations and into related litigative contexts.

The Second Circuit in *von Bulow* acknowledged that one traditionally recognized form of waiver is found when a privilege holder makes assertions in a litigation context that, in fairness, call for the revelation of privileged communications. *See von Bulow v. von Bulow,* 828 F.2d at 102. The quintessential example is the defendant who asserts an advice-of-counsel defense and is thereby deemed to have waived his privilege with respect to the advice that he received. *See, e.g., Joy v. North,* 692 F.2d 880, 893–94 (2d Cir.1982), *cert. denied,* 460 U.S. 1051, 103 S.Ct. 1498, 75 L.Ed.2d 930 (1983). Nonetheless, this principle is somewhat broader in scope, and has been generally recognized as requiring disclosure "when defendant asserts a claim that in fairness requires examination of protected communications." *United States v. Bilzerian,* 926 F.2d 1285, 1292 (2d Cir.), *cert. denied,* 502 U.S. 813, 112 S.Ct. 63, 116 L.Ed.2d 39 (1991).

■ The waiver may be found even if the privilege holder does not attempt to make use of a privileged communication; he may waive the privilege if he makes factual assertions the truth of which can only be assessed by examination of the privileged communication. *See, e.g., id.* (criminal defendant's general assertion of good-faith defense waives attorney-client privilege to permit assessment whether his attorney had told him that his acts were illegal); *Leucadia, Inc. v. Reliance Ins. Co.,* 101 F.R.D. 674, 679–80 (S.D.N.Y.1983); *Hearn v. Rhay,* 68 F.R.D. 574, 580–81 (E.D.Wash.1975). The governing principle was summarized in *Hearn v. Rhay,* in a passage cited with approval by the Second Circuit:

> All of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party. The factors common to each exception may be summarized as follows: (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus, where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct.

68 F.R.D. at 581. *See Bilzerian,* 926 F.2d at 1292 (citing *Hearn* ); *Bowne,* 150 F.R.D. at 488–89.

This has plainly occurred in connection with the Lynch report. Indeed, Kidder has made the invocation of that report and its conclusions a leitmotif of its approach both in judicial fora and in other "judicial"-type contexts.

The earliest documented use of the report following its preparation involved Kidder's transmittal of a purported "draft" of the document to the SEC with a cover letter requesting comments and suggestions from the Commission. This disclosure to the

Commission was not "extrajudicial" in the sense meant by the Second Circuit in *von Bulow*; indeed, the Court in *von Bulow* distinguished another case that also involved voluntary disclosure of a privileged document to the SEC, because such disclosure is in effect "made in a trial setting" and thus has "no application to disclosures in a book made outside a litigation context." 828 F.2d at 102 (distinguishing *Teachers Ins. & Annuity Ass'n of America v. Shamrock Broadcasting Co.*, 521 F.Supp. 638 (S.D.N.Y.1981)). *Cf. In re Steinhardt Partners, L.P.*, 9 F.3d 230, 234–36 (2d Cir.1993) (voluntary disclosure of document to SEC waived work-product immunity).

Moreover, the proffer of the report to the Commission at a time when that agency was apparently investigating both the Jett transactions and Kidder's possible responsibility for them was plainly an invocation of the substance of the report in a "litigative" context. This action represented a part of Kidder's continuing effort to influence the outcome of pending or anticipated litigations and agency investigations, and in this case to do so by persuading the SEC not only that Kidder was actively cooperating, but that it had intensively investigated the matter itself through an independent team of attorneys, and that those investigators had concluded that Kidder was not guilty of malfeasance.

This theme has since been consistently repeated by Kidder, both in the context of the arbitrations and in court. Moreover, in at least one instance a court has explicitly relied on the perceived substance of the report to rule in favor of Kidder's parent, GE.

Thus, for example, on September 20, 1994 Kidder filed a memorandum of law in New York State Supreme Court opposing Jett's demand for advancement of expenses to fund his arbitration against Kidder. In pressing its position, Kidder emphasized its contention that Jett was the sole wrongdoer, and it specifically invoked the Lynch report as an authoritative source of detailed information demonstrating the factual basis for its in-court assertion that it was merely a victim. Moreover, to the same end it cited the Lynch report's conclusions that Jett had engaged in fraudulent conduct, to the detriment of Kid-

der. (*See* Jett Proceedings Chart at 5–7 and Exh. 5.)

The next day Kidder's counsel submitted a letter to the NASD arbitration panel, arguing once more against Jett's request for an advance for expenses. Again, counsel invoked the findings of the Lynch report, which he described as having been "based on an exhaustive and thorough investigation," and as leading "to the inescapable conclusion that, as the Report concludes, Jett engaged in extensive fraudulent and unjustifiable trading activities." (*Id.* at 7–10 & Exh. 6.) The letter included additional characterizations of the factual findings by Lynch and used them to emphasize the contention that Kidder had been victimized. (*Id.*)

After State Supreme Court Justice Martin Stecher denied Jett's application for reimbursement of expenses, he appealed to the Appellate Division. In response to his motion to expedite the appeal, Kidder once again invoked the Lynch report, arguing that it demonstrated the misconduct of Jett and Kidder's victimization, and thus justified Kidder's refusal to underwrite Jett's litigation expenses. (Jett Proceedings Chart at 10–11 & Exh. 8). Kidder then repeated the identical argument in briefing the merits of that appeal. (*Id.* at 12 and Exh. 9).

In December 1994, Kidder and GE separately moved to dismiss the class action complaints filed against them in this court. In each of their briefs they referred specifically to the Lynch report as the · authoritative source of information as to the underlying facts, and argued, in part, that dismissal was appropriate because the report demonstrated that Jett had engaged in elaborate efforts to hide his scheme from Kidder and that Kidder was guilty of nothing more than simple negligence and had engaged in no deliberate misbehavior. This reasoning was subsequently adopted, at least in part, by Judge Keenan in granting the dismissal motion of GE. (*Id.* at 15 & Exh. 15.)

Finally, both in its memorandum to the NASD arbitration panel and in its counsel's oral argument to the panel, Kidder repeatedly invoked the Lynch report as an independent and reliable account of the facts and as

demonstrating, both in its summary of the facts and its assessment of responsibility, that Kidder was a victim of Jett. (*Id.* at 16, 19 & Exhs. 17, 18.) Based on those assertions, Kidder has pressed the panel to reject Jett's claim against the company.

This pattern of usage of the report by Kidder amply justifies the conclusion that it has put in issue the statements made by all interviewees, including Kidder employees, to Lynch and his colleagues in the course of their preparation of the report. Waiver necessarily follows. I separately examine each of these uses of the report.

■ The submission of the draft report to the SEC at a time when the Commission was considering the question of who was responsible for the scandal suffices to waive any privilege for the underlying documents. As the District of Columbia Circuit noted in an analogous circumstance, when a corporation provides an otherwise privileged internal investigative report to the SEC as part of an effort to obtain favorable treatment, it waives the privilege both for the report and for those underlying documents necessary for the Commission to evaluate the reliability and accuracy of the report. *See In re Sealed Case,* 676 F.2d at 818–22 (assessing submission of report under SEC voluntary disclosure program). This conclusion follows inexorably from the fact that the corporation necessarily surrenders any reasonable expectation of confidentiality for those documents when it proffers a report that relies on the other documents, unless it has assurances from the Commission that no further inquiry will be made. *See id.*[12]

The record in this case does not disclose the specific circumstances of the submission of the Lynch report to the SEC. Since, however, it is Kidder's burden to demonstrate its compliance with all elements of the privilege, including confidentiality, the absence of any evidence that Kidder could reasonably have expected the Commission simply to read the report and assume its ac-curacy undercuts its current claim of privilege. This conclusion is further supported by the undisputed fact that Kidder has supplied to the Commission a series of 85 so-called presentation binders to assist the Commission in its pursuit of Jett; as described, these binders contain substantial information gleaned by Lynch and his colleagues in the course of their investigation of the Jett transactions. (Affidavit of Lewis S. Fishbein, Esq., sworn to April 9, 1996, at ¶¶ 5–10 & Exhs. C–F.) Given this effort to cooperate with the Commission, and thus to gain the resultant benefit of apparent and actual good faith, even an outright assertion by Kidder that it would not have turned over interview summaries upon request by the Commission would be entirely implausible. Lacking even that representation, we conclude that Kidder had no expectation of confidentiality in the interview summaries.

The fairness doctrine is still more explicitly triggered by Kidder's use of the Lynch report in the pending lawsuits and arbitrations. As noted, Kidder has repeatedly proffered the Lynch report not merely as a signal of its own good faith, but as a reliable, if not authoritative, source of data on which the court should rely in reaching whatever conclusion would favor the company. Implicitly, then, Kidder is proffering the underlying facts on which the Lynch report is assertedly based, including particularly the statements made to the investigators by the witnesses whom they interviewed.

Having in effect made representations to the various courts and an arbitration panel as to the substance of those statements, Kidder cannot now invoke a privilege to bar disclosure of those documents or portions of documents that would reveal the substance of the statements. As Judge Conner recently noted in a very similar context, Kidder "seems guilty of the exact conduct that the subject matter waiver doctrine was formulated to address." *In re Leslie Fay Cos. Sec. Litig.,* 161 F.R.D. 274, 283 (S.D.N.Y.1995). In ef-

---

**12.** The fact that the documents here are sought by plaintiffs and not by the SEC is inconsequential. Kidder cannot "pick and choose" when to waive the privilege, allowing some to see the privileged documents and others not to. *See, e.g. In re Steinhardt,* 9 F.3d at 235; *Bowne,* 150 F.R.D. at 479 (citing cases). If the privilege was effectively waived vis-a-vis the SEC, it was waived as well for the parties in this litigation.

fect it would use the substance of the documents as a sword while at the same time invoking the privilege as a shield to prevent disclosure of the very materials that it has repeatedly invited the courts to rely upon. This it cannot do. *See generally In re von Bulow*, 828 F.2d at 103. *Cf. In re John Doe Corp.*, 675 F.2d at 489 (even if materials were originally privileged, their use for a purpose beyond that contemplated by the attorney-client privilege leads to a waiver); *United States v. Rosenthal*, 142 F.R.D. 389, 392 (S.D.N.Y.1992).[13]

As noted in *von Bulow*, subject-matter waiver will be found if "the privilege-holder has attempted to use the privilege as both 'a sword' and 'a shield' or where the attacking party has been prejudiced at trial." 828 F.2d at 103 (citing cases). As the Court there suggests, these conditions are satisfied when the privilege-holder not only discloses a privileged communication, but affirmatively makes use of it in litigation. Thus, the *von Bulow* court quotes Wigmore to the effect that "[t]he client's offer of his own or the attorney's *testimony* as to a *specific communication* to the attorney is a waiver as to all other communications to the attorney on the same matter." *Id.* (quoting 8 J. Wigmore, *Evidence* § 2327, at 638 (McNaughten rev. ed. 1961) (emphasis in original)).

We therefore conclude that Kidder's affirmative use of the Lynch report and, by implication, of the underlying interview documents, triggers a waiver of the privilege for those portions of the documents that embody the substance of any statements by Kidder employees interviewed by the Lynch team prior to the issuance of its report. In the exercise of our discretion, *see, e.g., In re Leslie Fay Cos. Sec. Litig.*, 161 F.R.D. at 284, we limit the piercing of the privilege to purely factual summaries of witness statements, and thus avoid any danger that the waiver might encompass core attorney men-

tal processes, for which we are required to demonstrate particular solicitude. *See, e.g., Bank Brussels Lambert v. Credit Lyonnais (Suisse) S.A.*, 1995 WL 598971, at *11–12 (S.D.N.Y. Oct. 11, 1995).[14]

## B. *Other Documents Sought By Plaintiffs and Jett*

Beyond the factual portions of the interview notes and memoranda, plaintiffs and Jett seek several narrower categories of information. These include all drafts of the Lynch report, so-called "Attorney–Client Advisory Materials" and a list of all individuals interviewed by Kidder's counsel since issuance of the Lynch report. I address each of these categories briefly.

Plaintiffs seek production of all drafts of the Lynch report. Although not discussed in great detail, we understand plaintiffs to argue that the drafts are not work product and that any attorney-client privilege has been waived through either (1) the issuance of the final report, (2) its use in litigation, (3) the transmittal of a draft of the report to the SEC, or (4) the production of at least one draft version of the report to the other parties in the lawsuit. Additionally, plaintiffs offer a general argument that Kidder cannot invoke the privilege in any respect by virtue of its fiduciary responsibilities to its shareholders.

For reasons already noted with respect to the final version of the Lynch report and the underlying interview documents, the drafts of the report have not been shown to qualify as work product. As for the attorney-client privilege, although the affidavits and other evidentiary information before the court are cloudy at best with regard to whether the drafts were intended to be reviewed by the client, the parties all appear to assume that this was the case. Accordingly, for present purposes we will infer that the drafts qualify

13. Kidder makes a suggestion that *In re John Doe Corp.* and *von Bulow* may be inconsistent to some degree. A fair reading of the two cases indicates otherwise, at least insofar as material to our analysis. *John Doe* addresses the circumstances in which a waiver may occur, whereas *von Bulow* is principally concerned with the scope of the waiver.

14. In view of these conclusions, we do not address plaintiffs' and Jett's alternative waiver arguments, nor, in this context, do we consider the asserted fiduciary exception to the privilege. That issue does crop up in our discussion of another category of documents.

474

for attorney-client protection absent some reason to invade the privilege.

■ The public release of the Lynch report does not waive the privilege for the drafts if they were otherwise protected by the privilege. A client may intend to direct or permit the release of the final version of a document while still intending that his communications with his attorney prior to the finalization of the document remain confidential. *See, e.g., Rattner v. Netburn,* 1989 WL 223059, at *4 (S.D.N.Y. June 20, 1989). That appears to be the case here.

As for Kidder's use of the report in litigations and other contexts, there is no basis for implying a waiver of the privilege for the drafts. The waiver found for the interview documents was premised on the notion that Kidder's invocation of the Lynch report amounted to a representation as to the substance and reliability of the interviewee statements, and in such a circumstance neither the other parties nor the court could fairly be denied access to those statements in order to assess the basis for Kidder's assertion.

The same reasoning does not apply to the drafts of the Lynch report. Whatever they may say, they are not crucial to a determination of the accuracy or reliability of the final report. That will turn in principal measure on a comparison between what the interviewees told Lynch and his colleagues, as reflected in the interview documents, and the description of the facts found in the final version of the report. There simply is no need for access to the drafts for that purpose.[15]

As for Kidder's production of a draft to the SEC, that act plainly waives the privilege for that particular draft. *See, e.g., In re Steinhardt,* 9 F.3d at 234–36. Plaintiffs offer no reason, however, to infer a broader waiver to cover other drafts if, as we assume, they were kept confidential.

Plaintiffs also point to Kidder's release for Rule 34 inspection of a draft of the Lynch report. We do not know whether this draft is identical to the one provided to the SEC, but, if not, it is still not clear whether the production was intended or inadvertent, and whether inadvertent production would be sufficient to waive the privilege for that document, much less for other drafts, if such there be.

In his belated reply letter, Kidder's counsel suggests that the production of this document and several other assertedly privileged items was indeed inadvertent, and that the error was not so unreasonable as to trigger a waiver. (*See* Wise April 24, 1996 Letter at 7–8.) Caselaw on inadvertent production makes it clear that the court is to engage in a case-by-case assessment of the circumstances surrounding the asserted error in order to determine whether the production was indeed inadvertent and, if so, whether the producing party exercised sufficient care to justify the conclusion that the release of the document should not constitute a waiver. *See, e.g., Asian Vegetable Research and Dev. Center v. Institute of Int'l Educ.,* 1995 WL 491491, at *7 (S.D.N.Y. Aug. 17, 1995); *Desai v. American Int'l Underwriters,* 1992 WL 110731, at *1 (S.D.N.Y. May 12, 1992).

At this stage Kidder has made no showing on this point, and its attorney's letter, which contains only conclusory assertions that the production was unintended and not unreasonable, adds nothing to its case. To assess the matter, we will permit Kidder, if it wishes to press the point and cannot obtain agreement from the other parties, to serve and file one or more affidavits addressing the relevant facts concerning the production in question.

■ Plaintiffs' final argument in general support of its demand for access to all drafts of the Lynch report involves the invocation of the so-called fiduciary exception to the attorney-client privilege. This principle is derived from a decision by the Fifth Circuit in *Garner v. Wolfinbarger,* 430 F.2d 1093, 1103–04 (5th Cir.1970), *cert. denied,* 401 U.S. 974, 91 S.Ct. 1191, 28 L.Ed.2d 323 (1971), holding, in the context of a derivative suit, that corpo-

---

15. It may be argued that variations between the draft and final versions of the report may reflect distortions in the final version to benefit Kidder. Even if true, this observation proves too much.

The same may be said for all drafts of documents published in final form, but that is not a sufficient justification, by itself, to override the privilege.

rate officials' invocation of the privilege of the corporation is subject to challenge on a showing of "good cause" for invading the privilege. That analysis has also been applied in the context of shareholder 10b–5 suits. *See, e.g., Fausek v. White,* 965 F.2d 126, 132–33 (6th Cir.), *cert. denied,* 506 U.S. 1034, 113 S.Ct. 814, 121 L.Ed.2d 686 (1992); *Ward v. Succession of Freeman,* 854 F.2d 780, 786 (5th Cir.1988), *cert. denied,* 490 U.S. 1065, 109 S.Ct. 2064, 104 L.Ed.2d 629 (1989); *In re Bairnco Corp. Sec. Litig.,* 148 F.R.D. 91, 99 n. 4 (S.D.N.Y.1993); *Panter v. Marshall Field & Co.,* 80 F.R.D. 718, 722–24 (N.D.Ill.1978). *Contra, Weil v. Investment/Indicators Research & Mgt., Inc.,* 647 F.2d 18, 23 (9th Cir.1981).

■ There are several apparent flaws, however, in plaintiffs' argument. First, the logic of the *Garner* approach may limit its application to parties who were shareholders at the time of the assertedly privileged communication, *e.g., Moskowitz v. Lopp,* 128 F.R.D. 624, 637 (E.D.Pa.1989); *In re Atlantic Financial Mgt. Sec. Litig.,* 121 F.R.D. 141, 146 (D.Mass.1988), or at least at the time when discovery is sought. It appears from the face of the complaint that the plaintiff class is limited to individuals who held shares on or before April 15, 1994, prior to either the creation of the draft reports or the commencement of this lawsuit. Plaintiffs offer no information as to whether they were shareholders at the relevant time.

Second, and more important, plaintiffs make no real effort to demonstrate good cause. The relevant criteria were summarized in *In re Bairnco* by Judge Conner, who placed heavy emphasis on the question of whether the documents were of central importance to the plaintiffs' case. 148 F.R.D. at 98–99 & n. 4. As we have noted, plaintiffs have the final Lynch report and will receive the factual, or non-analytical, portions of the interview documents. Under the circumstances, the drafts of the Lynch report are likely to be of only marginal significance. It also bears emphasis that the asserted misconduct of Kidder is not of a criminal nature, that plaintiffs make no showing as to the relative share of stock that they control, and that they do not demonstrate any other com-

pelling circumstances for requiring production of drafts of the report. *See id.* at 98–99 & n. 4. In short, we see no overriding reason to sanction the requested invasion of the privilege on the flimsy showing that plaintiffs have proffered.

■ Plaintiffs also target a category of documents that Kidder has identified as "Attorney–Client Advisory Materials." In substance, they complain that Kidder has not sufficiently identified the nature of these documents in its privilege log, and they ask that Kidder be directed, at the least, to supply document-by-document descriptions consistent with the requirements specified in *Bowne,* 150 F.R.D. at 474. Since this category apparently encompasses no more than approximately a dozen documents, there is no reason to excuse Kidder from providing the requested information. *See, e.g., Construction Prods. Research, Inc.,* 73 F.3d at 473–74.

■ The remaining issue raised by plaintiffs and Jett is a request that Kidder identify all individuals interviewed by its attorneys since completion of the Lynch report. Kidder has not responded to this demand, even though, on its face it might be viewed as trenching on the protection ordinarily afforded by the work-product rule. In the absence of any articulated objection, Kidder is to comply with this request.

### C. *Kidder's Request for Jett's Attorney Notes*

In the course of their investigation of Jett's transactions, both the SEC and the United States Attorney's Office interviewed Jett. Those interview sessions were of course attended by Jett's counsel, who took contemporaneous notes alluding to statements made by various participants that he thought significant. The notes, and summary memoranda prepared afterwards, apparently also contain observations of counsel about the significance of various matters raised during those sessions. (*See* Affidavit of John R. Cuti, Esq., sworn to March 19, 1996, at ¶¶ 3, 5–8.)

Kidder has requested production of these notes and any memoranda in which they may

have been incorporated. It appears to concede that these documents are in fact work product, as Jett contends, and couches its request as a conditional one, asking for production only if Kidder itself is ordered to produce interview notes. In support of its demand, it suggests that the two sets of documents—Kidder's and Jett's—must be treated alike. Moreover, it argues that it has a particularly compelling case for production since Jett may conceivably take the Fifth Amendment when deposed, as he apparently did at an early stage of the Government's investigation of his investment transactions.

■ Kidder's case fails on all fronts. First, the Jett documents are unquestionably covered by the work-product rule since his counsel was participating in the interviews and taking notes solely in anticipation of litigation. In contrast, as we have seen, Kidder had an entirely separate non-litigative agenda that motivated in substantial part its assignment of the Davis Polk lawyers to the task of interviewing witnesses and preparing a report. Second, Jett has made absolutely clear that his early invocation of the Fifth Amendment was undertaken because of unique circumstances prevailing at the time, and that it has been waived and will not be reasserted. Indeed, he reports without contradiction that he cooperated fully with the regulatory inquiries and stands ready to testify in all fora. Under these circumstances we do not view Kidder as having met its burden to demonstrate the compelling circumstances necessary to override the protection of the work-product rule.

### CONCLUSION

For the reasons stated, the applications of plaintiffs and defendant Jett to compel production by Kidder is granted to the extent noted. Kidder's application to compel discovery from Jett is denied. The parties shall provide the required information within two weeks.

SO ORDERED.

### CLARIFYING MEMORANDUM & ORDER

Defendant Joseph Jett seeks clarification of two aspects of this Court's Memorandum and Order dated May 16, 1996. First, he seeks a ruling that he is entitled to production not only of notes and memoranda embodying or describing statements made by interviewees in the course of preparation of the so-called Lynch report, but also of any factual or summary materials prepared by the Corporate Audit Staff of General Electric Company at the direction of the Davis Polk firm to assist, in whole or in part, the preparation of that report. Second, Jett seeks factual or summary materials prepared by Kidder's lawyers or the GE Corporate Audit Staff after issuance of the report. (*See* May 17, 1996 letter to the Court from Lewis S. Fischbein, Esq.)

Although the Court's prior decision could have been more explicit on the point, there is no question that its reasoning fully applies to the pre-report Audit Staff documents. Indeed, Kidder appears to concede the point. (*See* May 23, 1996 letter to the Court from Robert Wise, Esq.) Thus, Kidder is to produce those documents to the extent that they embody factual, as distinguished from purely "attorney analytical", materials.

■ Jett's other request stands on an entirely different footing. Materials developed by or for counsel subsequent to issuance of the Lynch report can have had no purpose, on the current record, other than to assist in litigation. Although work-product protection may be overcome on a substantial showing of need, Jett has not made the robust showing required to set aside the immunity that ordinarily attaches to such materials. All that he argues is that it would be much more convenient and less expensive for him to have the materials from Kidder, but that alone is not an adequate justification, or else every litigant of limited means could piggyback on the legal efforts of his more prosperous adversaries.

We do not say that in extreme circumstances a relatively impecunious litigant could not make the necessary showing. All that we need observe for the present is that Jett's very routine claim of limited resources does not demonstrate the appropriateness of a blanket rejection of Kidder's invocation of the work-product rule.

## CONCLUSION

For the reasons stated, defendant's Jett's application is granted to the extent noted.

Dated May 29, 1996.

SO ORDERED.